IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>MARQUIS D. LEE (01),<br><br>        Defendant. | Case No. 23-20067-01-DDC |

## MEMORANDUM AND ORDER

This matter comes before the court on defendant Marquis D. Lee's Motion to Suppress (Doc. 29). A grand jury indicted Mr. Lee on one charge of violating 18 U.S.C. § 922(g)(1), which prohibits felons from possessing firearms. Doc. 1 at 1. Mr. Lee argues that law enforcement officers unlawfully arrested him in his home, violating *Payton v. New York*, 445 U.S. 573 (1980). According to Mr. Lee, this unlawful arrest nullified his girlfriend's subsequent consent for officers to search their shared apartment. So, Mr. Lee asks the court to suppress the firearm that the police officers discovered in their search. This Order denies Mr. Lee's Motion to Suppress (Doc. 29).

**I. Background**

The court held an evidentiary hearing on Mr. Lee's motion on April 30, 2025. The court derives the following factual findings from the evidence presented during that hearing.

*Lead-Up to Arrest*

On February 17, 2023, Lawrence, Kansas police officers responded to a report of a disturbance involving a firearm. A caller reported that Mr. Lee brandished a black firearm at a

warehouse in Lawrence. Mr. Lee's temporary employer—the warehouse's operator—previously had fired Mr. Lee for making inappropriate sexual comments to a female employee. The day after the warehouse operator fired Mr. Lee, he returned to the warehouse. Mr. Lee asked about the female employee. When the reporting party told Mr. Lee that the female employee wasn't present, he lifted up his shirt, revealing a firearm in his waistband and said, "That bitch is lucky she ain't here today."

Officers retrieved Mr. Lee's last known address and phone number from a temporary employment agency, who had placed Mr. Lee at the warehouse. An officer tried to call Mr. Lee, but he didn't answer. Douglas County Dispatch successfully reached Mr. Lee by phone, but Mr. Lee disconnected the call.

### *Arrest*

Two officers—Sergeant Justin Rhoads and Officer Jamal Curry—went to the address reported by the temporary employment agency. The officers didn't have a warrant to arrest Mr. Lee or search his apartment.

The two officers approached the apartment door. One officer—Officer Curry—hid behind a corner while the other officer—Sergeant Rhoads—knocked on the door. An elderly woman, later identified as Rita Grogan, answered the door. Sergeant Rhoads asked Ms. Grogan if Mr. Lee was there. Ms. Grogan said, "I believe so." Suppression Mot. Hr'g Ex. 2 at 1:13 (Rhoads body camera). The officer responded, "Can you have him come out here and talk to me please?" *Id.* at 1:14. The woman said, "sure" and mostly closed the door. *Id.* at 1:15. The officer said again, "I just need to talk to him for a minute, please." *Id.* at 1:24. Around that time, the door mostly reopened (the video doesn't make clear who reopened the door), and the door remained open for the rest of the encounter. *Id.* at 1:25. The woman returned to the door and reported that Mr. Lee had asked for a minute. *Id.* at 1:51.

2

Sergeant Rhoads—through the open front door—saw Mr. Lee in a room inside the apartment. *Id.* at 1:51. He waved at Mr. Lee and said, "I just need to talk to you for a minute, man." *Id.* at 1:52. Mr. Lee waved back and said, "okay." *Id.*



*Id.* at 1:53 (altered to obscure minor's face and label Mr. Lee).

About 20 seconds later, the officer said, "How are you doing?" *Id.* at 2:12. At that point, Mr. Lee was near the front door. *See id.* Mr. Lee responded, "Alright, yourself?" *Id.* at 2:13. The officer said, "Good, go ahead and step on out here for me." *Id.* at 2:14. Sergeant Rhoads said something briefly to Officer Curry and then motioned for Mr. Lee to step out and again said, "Go ahead and step out here." *Id.* at 2:17. Continuing to motion for Mr. Lee to come out, the officer said, "Go ahead and close the door." *Id.* at 2:18. And again, he said, "Step on out here and close the door. I don't want to involve—I don't know if that's grandma or [trails offs]." *Id.* at 2:23. As Mr. Lee stepped out of the door, Sergeant Rhoads said, "Come here," grabbed Mr. Lee's arm, and started to tell him to turn around. *Id.* at 2:25. When Sergeant Rhoads grabbed Mr. Lee's arm, Mr. Lee was almost entirely outside the apartment.



Suppression Mot. Hr'g Ex. 3 at 2:16 (Curry body camera).

Once Sergeant Rhoads put his hands on Mr. Lee, Mr. Lee tried to retreat back inside the doorway. *Id.* at 2:17. A struggle ensued between Sergeant Rhoads and Mr. Lee. *Id.* Officer Curry tazed Mr. Lee, but he remained on his feet. *Id.* at 2:33. Mr. Lee retreated back into his apartment, but the officers still had their hands on him. *Id.* at 2:40. Eventually—after almost two minutes of struggling and after additional law enforcement personnel had arrived on scene—the officers pulled Mr. Lee out of the apartment and handcuffed him. *Id.* at 4:24. The officers then removed Mr. Lee from the premises. *Id.* at 5:57.

### *Post-Arrest Search*

After arresting Mr. Lee, the officers learned that Ms. Grogan's daughter—Kerri Carter, Mr. Lee's girlfriend—rented the apartment. The officers made a plan to hold the room until Ms. Carter arrived, and Ms. Grogan consented. Suppression Mot. Hr'g Ex. 2 at 6:37.

Officers called Ms. Carter and asked for consent to search her apartment. Ms. Carter told the officers that they could search when she arrived. When Ms. Carter arrived about 40 minutes

4

later, she gave written consent for the officers to search the apartment. Suppression Mot. Hr'g Ex. 4 at 41:54 (Zook body camera). Ms. Carter helped the officers search the apartment, and they found a firearm wrapped in a towel near the bathroom. *Id.* at 48:55. It is this gun that Mr. Lee seeks to suppress. Doc. 29 at 16.

## II.  Analysis

This Order denies Mr. Lee's Motion to Suppress (Doc. 29). Ms. Carter consented to the search of her apartment. So, the government's search of her and Mr. Lee's shared apartment was lawful under a well-established exception to the warrant requirement. Mr. Lee argues that the narrow exception to this rule announced in *Georgia v. Randolph*, 547 U.S. 103 (2006), spoils Ms. Carter's consent. Doc. 29 at 12. This exception provides that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Randolph*, 547 U.S. at 120. Mr. Lee is wrong for two independently sufficient reasons.

*First*, Mr. Lee never *expressly* objected to the search, and his implicit refusal—if any—doesn't suffice under Tenth Circuit law. *Second*, even if Mr. Lee objected to the search, he wasn't present when Ms. Carter consented. Mr. Lee argues that he wasn't present because the officers already had arrested him unlawfully. The court rejects that argument. Mr. Lee was in the doorway to his apartment when police arrested him, so his arrest was lawful under *United States v. Santana*, 427 U.S. 38 (1976), and its progeny. The court explains these conclusions, below, starting with background on consent searches.

### A.  Consent Searches and the *Randolph* Exception

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend.

IV. A search violates this Fourth Amendment protection "when it infringes on a reasonable expectation of privacy *or* when it involves a physical intrusion (a trespass) on a constitutionally protected space[.]" *United States v. Ackerman*, 831 F.3d 1292, 1307 (10th Cir. 2016) (emphasis in original). Thus, "a warrant is generally required before an officer may search or seize persons or property." *United States v. Warwick*, 928 F.3d 939, 943 (10th Cir. 2019) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).

Consent functions as one of the "'few specifically established and well-delineated exceptions'" to the warrant requirement. *Warwick*, 928 F.3d at 943 (quoting *Bustamonte*, 412 U.S. at 219); *Fernandez v. California*, 571 U.S. 292, 306 (2014) ("A warrantless consent search is reasonable and thus consistent with the Fourth Amendment irrespective of the availability of a warrant."). This "exception applies when the government proves (1) the officers received either express or implied consent and (2) that consent was freely and voluntarily given." *United States v. Guillen*, 995 F.3d 1095, 1103 (10th Cir. 2021) (citing *United States v. Jones*, 701 F.3d 1300, 1317 (10th Cir. 2012)).

Also, third-party consent can authorize a warrantless search. "The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Randolph*, 547 U.S. at 106; *Fernandez*, 571 U.S. at 294 ("Our cases firmly establish that police officers may search jointly occupied premises if one of the occupants consents." (footnote omitted)). The corollary of this rule is that people who live with others "assume[] the risk that one of their number might permit the common area to be searched." *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974).

Here, Ms. Carter validly consented to apartment's search. Ms. Carter—the tenant on the lease—signed a written consent form authorizing the search that discovered Mr. Lee's firearm. Suppression Mot. Hr'g Ex. 4 at 41:54 (Zook body camera). The court finds the following, a proposition that Mr. Lee never challenges: Ms. Carter had authority to consent to the search, and she expressly consented freely, knowingly, and voluntarily.

Undeterred, Mr. Lee argues that the *Randolph* exception vitiates Ms. Carter's consent. Doc. 29 at 10–15. In *Randolph*, the Supreme Court "recognized a narrow exception" to the general rule permitting officers to "search jointly occupied premises if one of the occupants consents." *Fernandez*, 571 U.S. at 294. There, "the Court held that '*a physically present inhabitant's* express refusal of consent to a police search of his home is dispositive as to him, regardless of the consent of a fellow occupant.'" *Id.* at 301 (emphasis in original) (brackets omitted) (quoting *Randolph*, 547 U.S. at 122–23). "*Randolph*'s 'narrow exception' to the consent rule 'applies only when the objector is standing in the door saying "stay out" when officers propose to make a consent search.'" *Watkins v. Wunderlich*, No. 22-1358, 2023 WL 4145904, at *7 (10th Cir. June 23, 2023) (quoting *Fernandez*, 571 U.S. at 294, 306).

Mr. Lee's motion rests on this narrow *Randolph* exception. But Mr. Lee can't satisfy either one of its requirements. He neither expressly refused consent nor was he present when Ms. Carter consented. The court explains these independent reasons for denying Mr. Lee's motion, below, starting with Mr. Lee's failure to refuse his consent expressly.

B.    **No Refusal to Search**

According to Mr. Lee, officers unlawfully arrested him after he implicitly refused to consent to a search. The court isn't persuaded by this argument. Mr. Lee never refused consent expressly, and Tenth Circuit precedent forecloses Mr. Lee's implied-refusal argument.

Mr. Lee never refused consent to search. Mr. Lee argues that he refused consent by "trying to retreat back inside his house and close the door on the officers" when they tried to arrest him. Doc. 29 at 11. But our Circuit's binding precedent demands more than implicit refusals. In *United States v. McKerrell*, defendant asked the Circuit "to infer that he impliedly refused consent when he closed his doors to the police[.]" 491 F.3d 1221, 1226 (10th Cir. 2007). The panel refused. *Id.* at 1227. It explained that the Supreme Court "explicitly declined to conduct this inquiry when it required the defendant to have *expressly* objected to the search." *Id.* (emphasis in original) (citing *Randolph*, 547 U.S. at 106); *id.* ("*Randolph* consciously employed a rule requiring an express objection by a present co-tenant."). *McKerrell* explained that the defendant's argument there—that the court should infer refusal from his conduct—flew in the face of "the Supreme Court's plain language" which adopted "consciously-imposed formalism[.]" *Id.* And on its facts, *McKerrell* explained that "*Randolph*'s narrow holding does not apply here." *Id.* at 1226.[1]

---

[1] No doubt, *McKerrell* is factually different than this case. There, police officers held a warrant to arrest the defendant. *McKerrell*, 491 F.3d at 1227. And our Circuit held that the arrest warrant would have authorized the search of defendant's home even if defendant had objected to the search expressly. *Id.* Still, the court concludes, *McKerrell* controls. Our Circuit's point about the warrant independently justifying the search was an alternative rationale for its holding. *See id.* Significantly—and what's controlling here—is that our Circuit interpreted *Randolph* to require an express objection. *Id.* To that end, our Circuit rejected defendant's implied-refusal argument. *Id.* at 1226–27.

Mr. Lee also cites a series of out-of-Circuit cases to support his position. Doc. 29 at 11. These cases by-and-large support Mr. Lee's argument that an implicit refusal can satisfy *Randolph*'s express-refusal standard. *E.g.*, *Bonivert v. City of Clarkston*, 883 F.3d 865, 875 (9th Cir. 2018) ("[Plaintiff] expressly refused entry when he locked the side door to his house."); *United States v. Williams*, 521 F.3d 902, 907 (8th Cir. 2008) (explaining that consent "was no longer valid once [defendant] slammed the door and put the dead bolt on"). But this court—"regardless of its views concerning the advantages of the precedent" of other Circuits—"must follow the precedent" of the Tenth Circuit. *United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990).

*McKerrell* controls here. Mr. Lee never said anything to the officers reasonably communicating his desire to withhold consent to search his apartment. To be sure, he tried desperately to retreat back into his home when Sergeant Rhoads attempted to place him in handcuffs. But under *McKerrell*, this conduct alone doesn't suffice to communicate an objection to a search.

What's more, even if conduct alone could satisfy *Randolph*'s express-refusal standard, Mr. Lee hasn't convinced the court that a desire to object to a search—as opposed to a desire to avoid arrest—motivated his conduct. Mr. Lee never objected to the police entering his home. After the officers arrested Mr. Lee, he saw them enter the apartment and speak to Ms. Grogan. And still, he did not object. *See* Suppression Mot. Hr'g Ex. 3 at 5:04 (Zook body camera). The court thus holds that Mr. Lee failed to object—expressly or otherwise—to the officers' search of the apartment. *See McKerrell*, 491 F.3d at 1226 ("[T]he district court here found that [the defendant's] sole concern was to avoid arrest . . . . The evidence supports this finding: [The defendant] never told the officers to stay out of his home . . . never expressed concern over the possibility of a search; and . . . never told officers to stay out of his home after . . . the police arrested him[.]"). This conclusion furnishes a separate basis for finding that Mr. Lee failed to refuse consent. *See id.* at 1226–27 (distinguishing *Randolph* where district court didn't err clearly in finding that defendant "acted solely to avoid arrest").

In short, our Circuit's precedent is clear: To invoke *Randolph*, a defendant must have objected expressly. *Id.*; *see also United States v. Blake*, 284 F. App'x 530, 537 (10th Cir. 2008) (refusing to consider *Randolph* exception where "there is no indication that [the defendant] objected to the search"). Mr. Lee failed to do so. And even if the court could infer an objection from his behavior, Mr. Lee's conduct suggests that he was concerned with avoiding arrest, not

9

with denying consent to search. So, *Randolph* offers him no relief. The court denies his motion.[2]

---

[2]  One might read some of the Court's language in *Fernandez* to cast doubt on the conclusion that Mr. Lee never objecting to the search serves as an independent basis for rejecting his motion. *See Fernandez*, 571 U.S. at 302 (explaining that "consent by one occupant might not be sufficient if . . . . the removal of the potential objector is not objectively reasonable"). Construed in the most defendant-friendly manner, that language could suggest that the unlawful arrest of a resident per se nullifies a subsequent consent search. But the court rejects that reading of this language—at least on these facts and these briefs.

As an initial matter, Mr. Lee argues that the court must find that he objected to the search. *E.g.*, Doc. 29 at 6 ("Because Mr. Lee's arrest was unlawful and his absence from the premises was due to that unlawful arrest, Kerri Carter's consent to search cannot govern over Mr. Lee's prior refusal to allow the officers entry into the apartment."); *id.* at 10 ("The court should rule that because Mr. Lee clearly demonstrated lack of consent to the officers entry before he was unlawfully removed from the apartment, the remaining occupants could not give a consent that would override Mr. Lee's non-consent."); Doc. 35 at 12 ("It would be unreasonable for the Court to create a rule which would allow an unconstitutional arrest *and non-consent to search* to be overridden by the consent of another person remaining in the home." (emphasis added)). To that end, the court views the issue "through the prism" of the framework presented by the parties. *United States v. Dominguez*, 998 F.3d 1094, 1110 (10th Cir. 2021). Viewed through that prism, Mr. Lee had to object to the search—and he never did. Relatedly, on a motion to suppress, the defendant bears the burden to demonstrate a causal relationship between a Fourth Amendment violation and the challenged evidence. *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000) ("At a minimum, a defendant must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."). And here, Mr. Lee's only causal-connection argument relies on his position that he objected to the search.

Moreover, the better interpretation of the *Fernandez* language is that an unlawful arrest or detention can excuse the *Randolph* requirement that the objector is present—not that an unlawful arrest automatically nullifies a subsequent search. *See United States v. Miller*, No. 21-294-MGL-1, 2022 WL 10067537, at *5 (D.S.C. Oct. 17, 2022) ("Taken together, *Randolph* and *Fernandez* indicate that if a co-occupant is removed from the premises due to an unlawful arrest, the rule requiring an objector's presence no longer applies."). After all, *Randolph* explained its dictum after acknowledging that it was "drawing a firm line"—one requiring that the objector "is in fact at the door and" objecting. 547 U.S. at 121. The two cases that Mr. Lee cites also support this distinction. In each case, unlike here, the defendant had objected expressly to the search before the unlawful detention. *See Gorsky v. Harris County*, No. H-16-2877, 2020 WL 533114, at *15 (S.D. Tex. Feb. 3, 2020) ("The officers removed Mr. Gorsky immediately after he refused consent to their entry into his home; arrested him after and at least in part because he refused to consent to their entry[.]"), *aff'd in part, appeal dismissed in part sub. nom. Gorsky v. Guajardo* (5th Cir. May 26, 2023); *Miller*, 2022 WL 10067537, at *5 ("[B]ut for the officers' unlawful conduct in searching Miller's backpack and then arresting him, he would have been present in the home *to continue his objection* to the search." (emphasis added)).

Finally, the court concludes, the arrest of Mr. Lee complied with governing law. So even if Mr. Lee's failure to object to the search weren't dispositive, the court would deny his motion all the same.

Finally, even if Mr. Lee had objected expressly to the officers' search of the apartment, the court still would deny his motion. That's because, as the court explains next, the officers didn't arrest Mr. Lee unlawfully.

### C. No Unlawful Arrest

Even assuming that Mr. Lee refused consent for the officers' search, the court still would deny his motion because he wasn't present when Ms. Carter consented and the officers didn't arrest him unlawfully. Mr. Lee argues that officers unlawfully removed him from his apartment.

In *Randolph*, the Supreme Court limited its holding "to situations in which the objecting occupant is present." *Fernandez*, 571 U.S. at 301. In dictum, *Randolph* explained that this physically-present requirement might not apply if there is "evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection[.]" 547 U.S. at 121. *Fernandez* clarified that this "dictum is best understood not to require an inquiry into the subjective intent of officers who detain or arrest a potential objector but instead to refer to situations in which the removal of the potential objector is not objectively reasonable." 571 U.S. at 302. Mr. Lee banks his argument on this caveat. But, as the court explains, the manner in which police officers detained Mr. Lee was lawful.[3]

---

[3] *Randolph* and *McKerrell* are in some tension with *Fernandez* on the question whether the subjective motivation of the police is relevant. *Compare Randolph*, 547 U.S. at 121 (requiring objector's presence unless there is "evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection"), *and McKerrell*, 491 F.3d at 1228 ("[W]e must ask only whether the evidence shows that the officers removed [the defendant] from the scene to avoid his possible objection. And on this point, there is no evidence that the police removed [the defendant] for this reason." (quotation cleaned up)), *with Fernandez*, 571 U.S. at 302 ("The *Randolph* dictum is best understood not to require an inquiry into the subjective intent of officers who detain or arrest a potential objector but instead to refer to situations in which the removal of the potential objector is not objectively reasonable."). The court needn't resolve this tension. The record doesn't reveal any evidence that police arrested Mr. Lee to subvert his objection to the search. Separately, the arrest of Mr. Lee was objectively reasonable. In short, under either approach, Mr. Lee isn't entitled to the relief he seeks.

Mr. Lee's unlawful-arrest argument relies largely on *Payton v. New York*, 445 U.S. 573, a seminal case where the Supreme Court struck down New York statutes allowing police officers to arrest a suspect in his home without a warrant. *E.g.*, Doc. 29 at 5. Mr. Lee contends that he was "forcefully dragged from inside his home and arrested without a warrant[.]" *Id.* at 6. The court isn't convinced. The officers had probable cause to arrest Mr. Lee for committing criminal threat, a violation of Kan Stat. Ann. § 21-5415 (a point Mr. Lee effectively concedes). *See* Doc. 35 at 17–18 ("The officers likely had probable cause and could have taken their search through more appropriate channels[.]"); *see also Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (en banc) ("A warrantless arrest is permissible when an officer has probable cause to believe that a person committed a crime." (internal quotation marks and citation omitted)). And by the time that officers detained Mr. Lee, he was approaching the opened front door, a location where he lacked any reasonable expectation of privacy. As such, *Payton* doesn't afford him any protection. The court explains this conclusion, below, starting with some additional legal background.

### 1. Additional Legal Background

Five cases—two from the Supreme Court and three from our Circuit—offer pertinent background about the legality of arrests in or near an arrestee's home.

In *Santana*, undercover officers arrived at defendant's home as she was standing in the doorway with a bag of money for drugs. 427 U.S. at 40. When officers announced that they were police officers, the defendant retreated into her home. *Id.* The officers followed her into her home and arrested her. *Id.* The Supreme Court held that arrest lawful. *Id.* at 43. It explained that the defendant—when standing in the threshold of the doorway—"was in a 'public' place." *Id.* at 42. That is, defendant "was not in an area where she had any expectation

of privacy." *Id.* "She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *Id.*

In *Payton*, the Supreme Court invalidated "New York statutes that authorize[d] police officers to enter a private residence without a warrant . . . to make a routine felony arrest." 445 U.S. at 574. The Court explained that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590.

*McKinnon v. Carr* involved a warrantless arrest of a man after police had knocked, identified themselves, and defendant answered the door. 103 F.3d 934, 935–36 (10th Cir. 1996). When defendant answered the door, police told him he was under arrest. *Id.* at 935. The defendant "asked if he could get dressed," and officers followed him into a bedroom. *Id.* Our Circuit found no wrongdoing by the police. It explained that after answering the door, the defendant was "in the threshold of his doorway, open to public view" and "was in a place sufficiently public that he had no legitimate expectation of privacy." *Id.* at 935. The Circuit acknowledged *Payton*'s admonition about the Fourth Amendment "drawing a firm line at the entrance to one's house" but found this admonition inapplicable on *McKinnon*'s facts. *Id.* at 936.

In *United States v. Flowers*, our Circuit held that the warrantless arrest of a defendant was unconstitutional. 336 F.3d 1222, 1231 (10th Cir. 2003). There, police officers suspected that defendant was selling liquor from his home illegally. *See id.* at 1223. Officers approached the home and knocked. *Id.* at 1224. The defendant—without opening the door—asked them what they wanted, and the officers ordered a cheap bottle of wine. *Id.* The defendant opened "a panel adjacent to the front door" and put his hand—holding the bottle of wine—through the opening. *Id.* One of the officers then said, "in a firm tone of voice, 'Tulsa Police Department,

13

open the door.'" *Id.* When the defendant opened the door 15 to 25 seconds later, the officers went inside and took defendant into custody (and found incriminating evidence in plain view). *Id.* Our Circuit found this procedure unlawful. It explained that police had arrested defendant when they commanded him to open the door. *Id.* at n.2 ("[A] reasonable person confronted by police officers outside his door at night and a command by one of the officers to allow them to enter, would have believed that he had to open the door of his home and submit to the show of authority. Accordingly, we hold that [defendant's] decision to open his door was not voluntary and he was arrested while in his home."). The *Flowers* panel distinguished *Santana* and *McKinnon* because the defendant in *Flowers* "was not visible to the public and his doorway was not open to public view." *Id.* at 1227–28. Only his hand and arm were visible, and "neither he nor the interior of his house [was] open to public view." *Id.* at 1228. In short, defendant "was not in a place sufficiently public that he had no legitimate expectation of privacy. Instead, he was within the privacy of his home[.]" *Id.* So, it was unlawful for police to arrest him and search his home.

Finally, in *United States v. Reeves*, the Circuit held that law enforcement officers—with no warrant—arrested the defendant in his home, violating *Payton*. 524 F.3d 1161, 1163 (10th Cir. 2008). There, at 2:43 a.m. a group of officers arrived at a motel where defendant had stayed for three months. *Id.* at 1164. The officers knocked on the motel door "for at least twenty minutes while yelling and identifying themselves as police officers." *Id.* "After approximately twenty minutes of banging and yelling," the defendant opened the door. *Id.* The Circuit explained "the location of the arrested person, and not the arresting agents . . . determines whether an arrest occurs within a home." *Id.* at 1165 (internal quotation marks and citation omitted). And it explained that "officers need not physically enter the home for *Payton* to

14

apply." *Id.* (citing *United States v. Maez*, 872 F.2d 1444, 1451 (10th Cir. 1989)). *Reeves* concluded that the officers' conduct—yelling loudly and banging on the door for more than 20 minutes in the middle of the night—"would lead a reasonable person to believe he was not free to ignore the officers." *Id.* at 1168. So, our Circuit concluded that the officers had seized the defendant in his home, and this warrantless seizure in defendant's home violated *Payton*. *Id.* at 1171.

### 2. Application

Because the door to the apartment was open, and Mr. Lee was in public view, this is a *Santana* case—not a *Payton* case. In other words, the open apartment door and Mr. Lee's visibility to the public as he approached that open door suggest that Mr. Lee lacked any objectively reasonable expectation of privacy. So, he can't rely on *Payton*'s protection of the home.

Also, the cases cited above make clear that an arrestee's expectation of privacy is critical for Fourth Amendment purposes. This principle explains the different results in the five cases cited. In *Payton*, *Flowers*, and *Reeves*, the defendants were inside their homes with doors closed. Officers thus violated those defendants' Fourth Amendment rights by arresting them—either physically or constructively—while they were in their homes. Not so in *Santana* or *McKinnon*. In each case, defendant's front door was open, and defendant lacked an objectively reasonable expectation of privacy. These binding cases thus suggest that when a defendant lacks a reasonable expectation of privacy, *Payton* doesn't apply. *See, e.g.*, *McKinnon*, 103 F.3d at 935–36 (explaining that *Payton* "has no application to a doorway arrest made in the circumstances of the present case" where defendant "was in a place sufficiently public that he had no legitimate expectation of privacy"); *Flowers*, 336 F.3d at 1227 (applying *Payton* where defendant "showed a conscious intention to protect the privacy of his home by utilizing only the small hole in the

wall" and exposing only his hand and arm); *see id.* at 1227 n.4 (characterizing as "an important finding of fact" that defendant was "inside his house with the front door closed" (emphasis omitted)).

Before applying this principle to the facts here, the court must determine when the officers seized[4] Mr. Lee. The point of seizure allows the court to determine Mr. Lee's expectation of privacy at the relevant time. "'A person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Reeves*, 524 F.3d at 1167 (quotation cleaned up) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Our Circuit employs a variation of this test when "the individual could not or would not wish to leave, even absent the police presence[.]" *Id.* In those instances, "'the appropriate inquiry is whether a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter.'" *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 436 (1991)). "Circumstances that indicate a seizure include, 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Id.* (quoting *Mendenhall*, 446 U.S. at 554). The court considers "the totality of the circumstances" to determine whether a seizure occurred. *Jones*, 701 F.3d at 1313.

Here, officers didn't seize Mr. Lee until—at earliest—he was close to the open front door. Recall that before that time, Sergeant Rhoads had knocked on the door and asked Ms. Grogan if she could have Mr. Lee come to the door to speak to him. And Sergeant Rhoads had spoken directly to Mr. Lee, who was visible in a room in the apartment through the open front

---

[4]   Our Circuit doesn't distinguish arrests and investigatory detentions in the home. *Reeves*, 524 F.3d at 1166–67. Both forms of seizures are subject to *Payton*'s protections. *Id.*

16

door, saying, "I just need to talk to you for a minute, man." The court holds that this interaction wasn't a seizure. The officer spoke in a conversational tone and made no show of authority when he communicated with Mr. Lee. *See Reeves*, 524 F.3d at 1167 (identifying "language or tone of voice" as a factor for determining whether a seizure has occurred (internal quotation marks and citation omitted)). Only one officer was visible to Mr. Lee, and the officers hadn't shown their weapons. *See id.* (identifying "the threatening presence of several officers" and "the display of a weapon by an officer" as relevant to seizure determination (internal quotation marks and citation omitted)). At the point when the officer asked Mr. Lee to come to the door, the officers hadn't touched Mr. Lee. Finally, the encounter happened at 1:30 pm. *Cf. id.* at 1169 (finding seizure where officers knocked on motel door between 2:30 and 3:00 in the morning, "a time which must be taken into consideration when analyzing the coerciveness of the encounter"). So, the court finds that a reasonable person would have felt "'free to decline the officers' request or otherwise terminate the encounter.'" *Id.* at 1167 (quoting *Bostick*, 501 U.S. at 436).

To be sure, Sergeant Rhoads expressed a "need" to speak with Mr. Lee. But the officer never directed or compelled Mr. Lee to come to the door. Given the casual demeanor and tone of the interaction, a reasonable person would have interpreted Sergeant Rhoads's statement as a *request*—not a compulsion—to come to the door and speak to him. In short, "under the totality of the circumstances," *Jones*, 701 F.3d at 1313, the court holds that Mr. Lee wasn't seized until he was at or near the front doorway of the apartment.

Having determined that the officers seized Mr. Lee at some point after he approached the front doorway, the court now turns to the question whether that seizure violated *Payton* and its progeny. It did not. Once Mr. Lee was near the open front door, he lacked a reasonable

expectation of privacy. As shown in Officer Curry's body camera, Mr. Lee fully was in public view.



Suppression Mot. Hr'g Ex. 3 at 2:08 (Curry body camera). And once Mr. Lee was in public view, *McKinnon* controls. The "firm line" drawn at the entrance of the home is of no moment where, as here, a defendant lacks any expectation of privacy. *See McKinnon*, 103 F.3d at 935. And like the *McKinnon* defendant, Mr. Lee here couldn't have had a reasonable expectation of privacy once he came near the open door. *See id.* ("[T]he suspect was visible, standing in the threshold of his doorway, open to public view. He was in a place sufficiently public that he had no legitimate expectation of privacy."); *cf. Flowers*, 336 F.3d at 1227 (applying *Payton* where defendant "showed a conscious intention to protect the privacy of his home by utilizing only the small hole in the wall" and exposing only his hand and arm). Recall that *Payton*'s general prohibition against warrantless arrests in the home didn't apply in *McKinnon* because defendant was in a position where he lacked any expectation of privacy. The same goes for Mr. Lee here. For the same reason, *Payton* doesn't help Mr. Lee here either.

In sum, the court concludes that the arrest of Mr. Lee was a lawful one. Officers had probable cause to believe that Mr. Lee had committed a felony offense, and his arrest in the doorway was lawful under the *Payton*/*Santana* line of cases. Because Mr. Lee was absent due to a lawful detention, he can't rely on the *Randolph* exception to override Ms. Carter's consent. *See Fernandez*, 571 U.S. at 303 ("[A]n occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason."). So the court denies Mr. Lee's Motion to Suppress.[5]

### III.  Conclusion

A co-occupant of Mr. Lee's apartment consented to the warrantless search that discovered the firearm Mr. Lee seeks to suppress. Mr. Lee invokes *Randolph*'s exception to the general rule that a co-occupant's consent authorizes a warrantless search and asks for relief on that basis. But none is available. *First*, Mr. Lee never refused consent *expressly*. *Second*, Mr. Lee wasn't present when Ms. Carter consented to the search. And Mr. Lee's argument that his absence was due to an unlawful arrest flounders. Officers had probable cause to arrest Mr. Lee, who lacked a reasonable expectation of privacy when officers seized him, so he can find no refuge in *Payton*. The court thus denies his Motion to Suppress (Doc. 29).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Marquis D. Lee's Motion to Suppress (Doc. 29) is denied.

**IT IS SO ORDERED.**

**Dated this 28th day of May 2025, at Kansas City, Kansas.**

s/ Daniel D. Crabtree
**Daniel D. Crabtree**
**United States District Judge**

---

[5]  Because the court concludes that the officers' warrantless search was lawful, the court needn't reach the government's inevitable-discovery argument. *See* Doc. 34 at 23–26.